RENDERED: DECEMBER 14, 2017
TO BE PUBLISHED

# Supreme Court of Kentucky

2016-SC-000389-MR

LINDA RICHMOND       APPELLANT

V.

ON APPEAL FROM MADISON CIRCUIT COURT
HONORABLE JEAN CHENAULT LOGUE, JUDGE
NO. 14-CR-00523-002

COMMONWEALTH OF KENTUCKY       APPELLEE

**OPINION OF THE COURT BY JUSTICE VANMETER**

**AFFIRMING**

Linda Richmond appeals as a matter of right from her conviction by jury and a 70-year sentence arising from charges of one count of first-degree assault, 11 counts of first-degree criminal abuse, and one count of second-degree assault stemming from the abuse of her boyfriend's minor child, N.V. For the following reasons, we affirm.

## I. PROCEDURAL AND FACTUAL BACKGROUND.

In 2014, Richmond was arrested with her boyfriend, Julio Valladares, after Richmond took Julio's daughter, N.V. to the emergency room where N.V. presented with bruises, pressure sores, dehydration, malnutrition, and an abnormally low temperature. After seventeen days in the hospital, N.V. was released to foster care.

Richmond and Valladares were each charged with one count of first-degree assault, one count of second-degree assault, and thirteen counts of first-degree criminal abuse. Before trial, Valladares reached a deal with the prosecution and pled guilty to several offenses in exchange for a recommended sentence of twenty years. Richmond chose to proceed to trial.

During a five-day trial in April 2016, the jury heard of the systemic abuse Valladares and Richmond inflicted upon N.V. designed to "break" N.V. of her autism. Richmond and Valladares lived together with N.V. and Richmond's teenage son. N.V. initially attended public school. However, after the school contacted Valladares regarding red marks on N.V.'s legs, discovered while assisting the child use the restroom, he initially asked that the school no longer assist her, but eventually took her out of school to be "homeschooled." Valladares admitted that he had no experience or plan for homeschooling N.V., and her instruction eventually disintegrated into N.V. being forced to sit for hours writing lines in a "corrections" binder. The binder contained over 300 entries, mostly dealing with "unfavorable" behavior and the punishments N.V. received for such behavior. Most of this behavior and punishment centered around N.V.'s accidental or untimely urination and defecation. N.V. was restrained at the table writing corrections for so long that she developed pressure sores on her buttocks and legs, which were sprayed with alcohol to clean the wounds, but also to "wake her up." In addition, N.V. was forced to remain in her soiled bed if she had an accident during the night, and eventually she was forced to sleep on a trash bag or puppy pad directly on the

2

floor. Text messages between Valladares and Richmond also referred to N.V. having feces applied to her face and made to ingest her urine or feces.

During trial, Valladares admitted that he and Richmond abused N.V., and, in fact, much of the abuse seemed crafted by Richmond; she even drafted a routine to make sure Valladares stuck to the "schedule" of abuse while she was at work. Other forms of abuse included forcing N.V. to endure cold showers, sometimes every hour, resulting in the phrase "showers on the hours" to be used in the home. Investigators also found a leather belt hanging next to the shower, purportedly for Valladares to whip the child in the shower. Valladares and Richmond also withheld food from N.V. and made her "earn" the food she was given, resulting in extreme malnutrition and starvation over time. In contrast, Richmond's son did not endure any of this treatment, coming and going as he pleased, with his own mini fridge in his room.

Eventually, N.V.'s condition became so dire that Richmond was compelled to bring her to the hospital, at which time the child abuse became evident. During police interviews, Richmond initially denied any abuse, alleging, among other statements, that N.V. had been fine a few days earlier, that she had no idea what could have caused the pressure sores, and that she had never limited N.V.'s food intake. But when confronted with Valladares's statements and evidence contrary to her version of events, Richmond admitted to the abuse, *e.g.*, forcing N.V. to remain in a soiled bed or on puppy pads, spanking N.V. while she was in the cold shower, and knowing that Valladares gave N.V. cold showers.

3

After deliberating for a little over an hour, the jury returned a guilty verdict for one count of first-degree assault, one count of second-degree assault, and 11 counts of first-degree criminal abuse,[1] with a recommended sentence to run consecutively for a total of 90 years. In June 2016, the trial court denied Richmond's motion for a new trial and sentenced her to total of 70 years. This appeal follows as a matter of right.

## II. ANALYSIS.

Richmond's appeal concerns the testimony of N.V.'s current foster mother, Curry, on the fourth day of trial.

First, Richmond argues that Curry's testimony was not relevant to the abuse that occurred months before, and thus should not have been admitted. Richmond objected to the relevancy of Curry's testimony; therefore, we review the trial court's ruling for an abuse of discretion. We "will not disturb the trial court's decision to admit evidence absent an abuse of discretion." *Anderson v. Commonwealth*, 231 S.W.3d 117, 119 (Ky. 2007). The test for an abuse of discretion "is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Goodyear Tire & Rubber Co. v. Thompson*, 11 S.W.3d 575, 581 (Ky. 2000) (citing *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999)).

Curry testified to general information about N.V., including that she received N.V. in August 2015 from another foster family, and that N.V. was ten

---

[1] Two of the thirteen counts of criminal abuse were dismissed during the trial.

4

years old at that point. She further testified that N.V. was "very delayed for her age" with a "really low IQ" and had comprehension problems with language; she testified that N.V. was currently in special education at school, learning at a kindergarten level. Curry stated that she had to work daily with N.V. about having bowel movements since the child was afraid to evacuate her bowels because "poop came from a bad place," and would hold it, once for almost two weeks, sometimes needing medication to facilitate bowel movements. Curry also testified that N.V. would not even say the word "poop," rather she called all bathroom activities, "pee." Curry further testified that N.V. had to be coaxed into a bathtub, needing to check the temperature before she got in, and that showers "were completely out" because N.V. suffered meltdowns at the thought of entering a shower. Curry described getting N.V. into the bathtub as a "big ordeal." Curry also explained how N.V. refused to use any sort of writing utensil and that N.V. "loves to eat," becoming excited when fed.

Richmond argues that the foster mother's testimony was irrelevant, and unfairly prejudicial, outweighing its probative worth. KRE[2] 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." "Evidence which is not relevant is not admissible." KRE 402. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by

---

[2] Kentucky Rules of Evidence.

5

the danger of undue prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." KRE 403. "KRE 403 allows for the exclusion of evidence that may be unduly prejudicial. Evidence that appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish, or otherwise may cause a jury to base its decision on something other than the established propositions in the case is unfairly prejudicial." *Butler v. Commonwealth*, 367 S.W.3d 609, 615 (Ky. App. 2012) (internal quotations and citation omitted).

The Commonwealth presented ample evidence during the four days prior to Curry's testimony, including graphic photographs of N.V. in the hospital and horrific testimony from the child's own father. We note that the physical responses of N.V. to certain situations so paramount to her abuse case, *e.g.*, the shower, eliminating her bowels, writing utensils, are especially relevant to this case. Furthermore, Curry did not testify about the abuse or its effect on N.V.; rather, she merely described the current state of the child's abilities and stressors. Given the weight of the evidence against Richmond, this testimony was relevant and not unduly prejudicial. We find no abuse of discretion with the trial court's admission of Curry's testimony.

Richmond next argues the admission of Curry's testimony constituted improper victim impact evidence. This issue is unpreserved, and thus reviewed for palpable error. RCr[3] 10.26 dictates:

---

[3] Kentucky Rules of Criminal Procedure.

6

A palpable error which affects the substantial rights of a party may be considered by the court on motion for a new trial or by an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that manifest injustice has resulted from the error.

"RCr 10.26 authorizes us to reverse the trial court only upon a finding of manifest injustice. This occurs when the error so seriously affected the fairness, integrity, or public reputation of the proceeding as to be shocking or jurisprudentially intolerable." *Roe v. Commonwealth*, 493 S.W.3d 814, 820 (Ky. 2015) (internal quotations and citations omitted).

This Court has held it permissible to introduce evidence during the guilt phase regarding background information about the victim, including physical condition. *See, e.g., Ernst v. Commonwealth*, 160 S.W.3d 744, 763 (Ky. 2005) (holding it permissible for the victim's family to describe the elderly victim's physical limitations, including that she was drawing disability payments, which the Court found to be "especially relevant" since the defendant claimed that the victim attacked him with a vase); *Wheeler v. Commonwealth*, 121 S.W.3d 173, 181 (Ky. 2003) (holding no prejudicial error for the Commonwealth's witness to testify that victim was pregnant); and *Campbell v. Commonwealth*, 788 S.W.2d 260, 263 (Ky. 1990) (holding no error in allowing the victim's friend to testify that victim was a teacher, lifted weights and jogged six miles per day).

"[A] certain amount of background evidence regarding the victim is relevant to understanding the nature of the crime." *Bussell v. Commonwealth*, 882 S.W.2d 111, 113 (Ky. 1994). The prosecution can introduce evidence in

7

the guilt phase identifying a victim as a living person rather than a simple statistic. *McQueen v. Commonwealth*, 669 S.W.2d 519, 523 (Ky. 1984). Although background evidence regarding the victim is relevant to understanding the nature of the crime, "[v]ictim impact evidence differs from victim background evidence, in that the former is 'generally intended to arouse sympathy for the families of the victims, which, although relevant to the issue of penalty, is largely irrelevant to the issue of guilt or innocence.'" *Ernst*, 160 S.W.3d at 763 (quoting *Bennett v. Commonwealth*, 978 S.W.2d 322, 325–26 (Ky. 1998)). "Such evidence does not unduly prejudice a defendant 'as long as the victim is not glorified or enlarged.'" *Ernst*, 160 S.W.3d at 763 (quoting *Bowling v. Commonwealth*, 942 S.W.2d 293, 302–03 (Ky. 1997)).

In this case, Curry was very matter of fact, speaking in a moderate, soft tone; she was not "overly emotional, condemnatory, accusative, or demanding vindication." *Foley v. Commonwealth*, 953 S.W.2d 924, 937 (Ky. 1997). Additionally, Curry's testimony "was not riddled with emotional outbursts, nor was it overly expounded upon by the prosecution." *Campbell*, 788 S.W.2d at 264. In fact, the Commonwealth did not even mention Curry's testimony again during the trial or during closing argument. Curry's testimony did not rise to the level of an impermissible victim impact statement. Accordingly, we conclude that this testimony was permissible victim background evidence, and did not result in any manifest injustice.

Last, Richmond argues that the trial court committed reversible error in permitting Curry to testify as an expert regarding the neurological responses of

8

children with autism. As this argument is unpreserved, we review for palpable error pursuant to RCr 10.26.

Specifically, Richmond objects to a short portion of Curry's testimony that:

> N.V. has different neurological responses. Children with autism have executive functioning issues. She has times she will squeeze her jaw, squeeze her arms around her body, flap her arms, and her hands in response to various things she may be reacting to. It could be good, bad, happy, sad, excited, scared. Flapping is very normal in the autistic world – most autistic children flap, and they flap for different reasons; it could be excited, scared, stressed.

Richmond argues that this constitutes improper expert testimony in violation of KRE 702, which requires an expert be qualified "by knowledge, skill, experience, training, or education" if the testimony is "based upon sufficient facts or data; . . . the product of reliable principles and methods; and the witness has applied the principles and methods reliably to the facts of the case." Richmond asserts that Curry "should have never been permitted to testify to the 'neurological responses' of children with autism," and this improper testimony led to undue prejudice, which swayed the jury "by bolstering the testimony regarding N.V.'s abilities." We disagree that this evidence constitutes expert testimony.

KRE 701 provides:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are:
> (a) Rationally based on the perception of the witness;

9

(b) Helpful to a clear understanding of the witness'
testimony or the determination of a fact in issue; and
(c) Not based on scientific, technical, or other
specialized knowledge within the scope of Rule 702.

Although Richmond is correct that a foster parent may not testify as an expert witness competent as to the existence of abuse, Curry did not testify in any way as to the existence of abuse nor to how abuse affects autistic children neurologically. *See Crum v. Com., Cabinet for Human Res.*, 928 S.W.2d 355, 357 (Ky. App. 1996). When reviewed in context, Curry did not testify as an expert on neurological responses of children with autism; rather, she testified to common behaviors of autistic children specifically related to N.V.'s autistic behaviors, most presumably based on the eight months she had cared for the child. Further, this testimony was especially helpful to this case since the main impetus of the abuse inflicted upon N.V. by Richmond was to "break" her of autistic behaviors. This testimony did not unfairly prejudice Richmond, and the trial court did not err in allowing Curry to testify as a lay witness regarding her experiences with N.V.

### III. CONCLUSION.

We conclude that the trial court did not err in allowing the testimony of the foster mother, Curry. Accordingly, we find no reversible error, and affirm the judgment of conviction and sentence.

All sitting. All concur.

10

COUNSEL FOR APPELLANT:

Karen Shuff Maurer
Assistant Public Advocate
Department of Public Advocacy


COUNSEL FOR APPELLEE:

Andy Beshear
Attorney General of Kentucky

Jeffrey Allan Cross
Assistant Attorney General